# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DANIEL LOUTH, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>    v.<br><br>NFL ENTERPRISES LLC,<br><br>                    Defendant. | Case No. 1:21-cv-00405<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Daniel Louth ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## <u>NATURE OF THE ACTION</u>

1.    This is a class action suit brought against Defendant NFL Enterprises LLC ("NFL" or "Defendant") for violations of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. §§ 2710, *et seq*, and the Rhode Island Video, Audio, and Publications Rentals Privacy Act ("RIVRPA"), 11 R.I. Gen. Laws § 11-18-32.

2.    Defendant develops, owns, and operates a mobile application, titled "NFL" ("NFL App" or "App"), which describes itself as a "pure football app" that disseminates "live local and primetime games, exciting videos and highlights, and replays of every game."[1]

---

[1] NFL, https://play.google.com/store/apps/details?id=com.gotv.nflgamecenter.us.lite&hl=en_US&gl=US.

3. Unbeknownst to Plaintiff and members of the Classes, however, Defendant knowingly and intentionally discloses its users' personally identifiable information—including a record of every video viewed by the user—to unrelated third parties.

4. The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

5. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710. "Personally identifiable information" ("PII") is defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

6. Similarly, the RIVRPA prohibits "any person to reveal, transmit, publish, or disseminate in any manner, any records which would identify the names and address of individuals, with the titles or nature of video films … or the like, which they purchased, leased, rented, or borrowed, from libraries, book stores, video stores, … or any retailer or distributor of those products." 11 R.I. Gen. Laws § 11-18-32(a).

7. Plaintiff brings this action for damages and other legal and equitable remedies resulting from Defendant's violations of the VPPA and RIVRPA.

## FACTUAL BACKGROUND

**I.    The VPPA And The RIVRPA**

8. The impetus for the VPPA was President Ronald Reagan's nomination of Judge

Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper, who then published that history. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

9.       In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

10.      The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

11.      Similar to the VPPA, the RIVPRA prohibits "any person to reveal, transmit, publish, or disseminate in any manner, any records which would identify the names and addresses of individuals, with the titles or nature of video films, records, cassettes, or the like, which they

purchased, leased, rented, or borrowed, from libraries, book stores, video stores, or record and cassette shops or any retailer or distributor of those products." 11 R.I. Gen. Laws § 11-18-32(a).

## II.    Setup And Use Of The NFL App

12.    Defendant develops, owns, and operates the NFL App.

13.    Consumers can download the NFL App through the Google Play Store on Android devices or the Apple App Store on iOS devices. Once downloaded, the NFL App requests permission from the user to access their location through the mobile device's GPS.

14.    At no point does Defendant receive permission from users to share their location information, personally identifiable information, or video viewing information with third-parties.

15.    Consumers can use the NFL App to view football highlight videos, live games, and game analyses.

## III.    Testing Reveals That Defendant Is Illegally Sharing Users' Video-Viewing Information With A Third Party

16.    In the Summer of 2021, Plaintiff's counsel retained a private research company to conduct a dynamic analysis of the NFL App. The researchers analyzed the disclosures made from NFL to third parties when watching a highlight video available to all NFL App users. This analysis revealed that Defendant transmits information sufficient to identify class members and the videos they watch to an unrelated third party.

17.    The analysis established that Defendant incorporates multiple "application programming interfaces" ("APIs") into its App.

18.    APIs "enable[] companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies."[2]

19.    Google Analytics is an example of an API.  When developers, like Defendant, integrate the Google Analytics API into their applications, Google will "create reports to answer questions like: How many daily active users has my Android app had in the last week?  How many page views has each of the top 10 page URLs for my site received in the last 28 days?"[3]  In exchange, Google retains and repurposes the data the application transmits, which Google then uses to support other ventures, like targeted advertising.

20.    Defendant integrates the Anvato API, which is owned by Google, into its App.

21.    The dynamic analysis found that when a user enables location services, Defendant transmits to Google, through the Anvato API, a user's geolocation, a user's advertising ID, and a unique video identifier of the video(s) viewed by the user.

22.    As to geolocation, the analysis found that the Anvato API is receiving a user's precise geolocation with more than three decimal places of accuracy (*i.e.*, within less than forty feet of the user).[4]  In other words, this type of geolocation can be considered precise, as it provides street level accuracy.

---

[2] IBM CLOUD EDUCATION, APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

[3] GOOGLE ANALYTICS, ANALYTICS DATA API OVERVIEW, https://developers.google.com/analytics/devguides/reporting/data/v1.

[4] James R. Schmidt, Jr., BSME, *GPS Coordinates: How Many Decimal Places Do You Need?*, DJS ASSOCIATES, https://www.forensicdjs.com/blog/gps-coordinates-many-decimal-places-need/.

23.     An Advertising ID ("AAID") is a unique string of numbers that attaches to a device (such as a mobile phone).  As the name implies, an AAID is sent to advertisers and other third parties so they can track user activity across multiple mobile applications.[5]  So, for example, if a third-party collects AAIDs from two separate mobile applications, it can track, cross-correlate and aggregate a user's activity on both apps.

24.     As to the unique video identifier, Anvato is receiving the Video MCP ID.  The MCP ID is a short string of numbers that links to a particular video name.  For instance, the dynamic analysis found that the MCP ID for the video "Everything You Need to Know About the 2021 NFL Season" was 1065895.

25.     Anvato is receiving these identifiers through its API, "Tkx.mp.lura.live," which is Anvato's video player.[6]  Anvato's video player allows it to identify which video was played (*i.e.*, the video title) using the MCP ID.[7]

### A.     Overview Of Google's Anvato

26.     When developers build a mobile application, they typically rely on third parties to provide services for the app, like advertising, analytics, and video production.  As Google puts it, "[f]or most premium content business models, there are roughly one dozen (or more) components of the video ecosystem that perform various tasks from ingest to transcoding, protecting and managing content to monetization, delivery and analytics."[8]

---

[5] *See* GOOGLE, ADVERTISING ID, https://support.google.com/googleplay/android-developer/answer/6048248?hl=en#zippy=%2
Cadvertising-id-violations%2Chow-to-opt-out-of-personalized-ads.

[6] WELCOME TO MCP, https://mcp.mp.lura.live/.

[7] QUICK START, PLAYING A VIDEO FROM MCP, https://dev.anvato.net/api/player#playing-a-video-from-mcp.

[8] ANVATO, SIGNAL-TO-SCREEN OTT SOLUTION BRIEF, at 2 (2016), attached hereto as **<u>Exhibit 1</u>**.

27.     Anvato does much more than merely provide video services for the NFL App.  The Anvato platform provides "100% workflow automation," providing nine distinct services in one product:



28.     Google uses the above graphic in its marketing materials for Anvato, and as the graphic demonstrates, Anvato's platform provides "monetization" and "analytics" for mobile applications.   As discussed in greater detail below, Defendant knowingly and intentionally discloses class members' PII to Google so its Anvato platform can monetize and analyze the NFL App.

29.     Specifically, the Anvato platform offers "a fully managed, end-to-end video processing and management platform for signal acquisition, live and video-on-demand editing, hybrid encoding, social and premium syndication, dynamic ad insertion, authenticated playback, video analytics and player SDKs across all connected devices."  By utilizing the Anvato platform,

video service providers can "[e]liminate the headaches of multiple vendor management, mobile optimization, disparate workflows and inefficient execution on [their] strategy."[9]

### B.    NFL Discloses Class Members' Geolocation Data To Google

30.    "Geolocation is the identification of the real-world geographic location of an object. This identification is done by generating a set of geographic coordinates such a latitude and longitude through GPS and using the coordinates to determine a meaningful location."[10]

31.    In 2013, researchers conducted a study that analyzed mobility data for 1.5 million people and found they needed only four randomly chosen spatio-temporal points (points that represent the time and location of a specific event, such as watching a video) to uniquely identify 95% of the people (approximately 1.425 million out of 1.5 million) in the dataset.[11]

32.    As Paul Ohm, a law professor and privacy researcher at Georgetown University Law Center, explained: "Really precise, longitudinal geolocation information is absolutely impossible to anonymize.  D.N.A. is probably the only thing that's harder to anonymize than precise geolocation information."[12]

33.    Companies collect and leverage a user's geolocation to maximize their advertising revenue.  As a New York Times article explained:  "For brands, following someone's precise movement is key to understanding the 'customer's journey'—every step of the process from seeing

---

[9] ANVATO, GOOGLE'S COMPLETE OTT VIDEO PLATFORM, NOW ON GOOGLE CLOUD PLATFORM, https://cloud.google.com/blog/topics/inside-google-cloud/anvato-googles-complete-ott-video-platform-now-google-cloud-platform.

[10] WHAT IS GEOLOCATION?, https://www.indicative.com/resource/geolocation/.

[11] Yves-Alexandre de Montjaye, et al., *Unique in the Crowd: The privacy bounds of human mobility*, SCIENTIFIC REPORTS 2 (Feb. 4, 2013), https://www.nature.com/articles/srep01376.

[12] Stuart A. Thompson & Charlie Warzel, *Twelve Million Phones, One Dataset, Zero Privacy*.

an ad to buying a product.  It's the Holy Grail of advertising, one marketer said, the complete picture that connects all of our interests and online activity with our real-world actions."[13]

34.    Defendant uses Google's Anvato to collect and leverage a user's geolocation so it can maximize advertising revenue and, to that end, uniquely identify its users.  As Matt Smith, former Chief Evangelist for Anvato, remarked: "[W]e can deliver individual ads even down to the user.  If someone is within a couple hundred yards or meters of a coffee shop for example and we have an ad break that comes up the advertiser can target that viewer and give them that ad as they are in close proximity to the store."[14]

35.    When asked how this trend will develop, Matt Smith answered: "I think we are going to see more and more personalized content.  Most all of us have a device that sits in our pocket.  The device has an IP address and GPS unit in it.  So like never before, and I say this in a non-creepy, big-brother way, we're able to really target the viewer wherever they are."[15]

36.    But even though Mr. Smith tries to downplay the invasive nature of this process by calling it "non-creepy" and non "big-brother," it is still illegal, as this information enables Google to identify consumers watching videos on the NFL App with a high degree of accuracy.

37.    The dynamic analysis found that NFL discloses to Google a user's precise geolocation with more than three decimal places of accuracy (*i.e.*, within less than forty feet of the user).  In other words, this type of geolocation can be considered precise, as it provides street level accuracy.

---

[13] *Id.*

[14] Neil C. Hughes, *63: Anvato End to End Video Streaming & Monetization Platform*, THE TECH BLOG WRITER (2016), https://tinyurl.com/2p97ek46.

[15] *Id.*

### C.    Defendant Discloses Class Members' Advertising IDs To Google

38.    Geolocation is not the only PII that NFL discloses to Google.  NFL also discloses class members' Advertising IDs as well.[16]

39.    An Advertising ID ("AAID") is a unique string of numbers that attaches to a device (such as a mobile phone).  As the name implies, an AAID is sent to advertisers and other third parties so they can track user activity across multiple mobile applications.[17]  So, for example, if a third-party collects AAIDs from two separate mobile applications, it can track, cross-correlate, and aggregate a user's activity on both apps.

40.    Although technically resettable, an AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets their AAID.  The fact that use and disclosure of AAIDs is so ubiquitous evinces an understanding on the part of Defendant, Google, and others in the field that they are almost never manually reset by users (or else an AAID would be of no use to advertisers).

41.    Using publicly available resources, an AAID can track the user's movements, habits, and activity on mobile applications.[18]  In other words, "[t]he AAID is the passport for aggregating all of the data about a user in one place."[19]

---

[16] For Google, this is known as the "Google advertising ID"; for Apple, this is known as the "identifier for advertisers."

[17] *See* GOOGLE, ADVERTISING ID, https://support.google.com/googleplay/android-developer/answer/6048248?hl=en#zippy=%2 Cadvertising-id-violations%2Chow-to-opt-out-of-personalized-ads.

[18] Thomas Tamblyn, *You Can Effectively Track Anyone, Anywhere Just By The Adverts They Receive*, HUFFPOST, Oct. 19, 2017, https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5.

[19] Willie Boag, *Trend Report: Apps Oversharing Your Advertising ID*, IDAC, https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/

42.    Because an AAID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading and viewing preferences.

43.    Google collects an enormous amount of detailed information about a given consumer's online behavior (as well as unique identifiers associated with a user's devices) from a variety of sources.

44.    Once Google links a device's AAID with its owner, it can connect new information retrieved from Android apps—including the NFL App—with existing data in the person's profile (which was previously collected by Google from other sources).

45.    As Professor Douglas C. Schmidt of Vanderbilt University wrote, Google's "business model is to collect as much data about you as possible and cross-correlate it so they can try to link your online persona with your offline persona.  This tracking is just absolutely essential to their business.  'Surveillance capitalism' is a perfect phrase for it."[20]

46.    With the disclosed information, Google can associate a user's AAID with a corresponding "Google profile," and is able to use that aggregated information to identify a particular person.

47.    Although the AAID by itself is sufficient to identify an individual, Defendant pairs it with a user's geolocation.  Disclosing an AAID and geolocation together allows Google to have a reference point for each location it collects.  In other words, when Defendant transmits location points, Google is able link those points together with the AAID.  These two identifiers also allow

---

[20] Lily Hay Newman, *The Privacy Battle to Save Google From Itself*, WIRED (Nov. 1, 2018), https://www.wired.com/story/google-privacy-data/; *see generally* SHOSHANA ZUBOFF, THE AGE OF SURVEILLANCE CAPITALISM: THE FIGHT FOR A HUMAN FUTURE AT THE NEW FRONTIER OF POWER (2019).

Google to create synergetic inferences about user activity.  With AAIDs, Google can create inferences from a user's online activity; with geolocation, Google can create inferences from a user's offline activity.

48.    Accordingly, Google is able to identify specific users each time they watch a video because Defendant transmits a user's geolocation and AAID whenever a video is played.

**D.    Defendant Discloses The Videos That Class Members Are Watching to Google**

49.    When Defendant transmits a user's geolocation and AAID, it also transmits a user's video ID which identifies the video that is being watched.

50.    The video ID enables Google to "look[] at video the same way the human eye does."[21]

51.    Anvato began as "a startup that can identify videos across the web using an automated visual detection engine".[22]

52.    Google's Anvato platform "incorporate[s] its proprietary software-based Live Streaming, Live Ad Replacement, Scalable Video Editing, Perceptual Signature, Content Tracking, and onTarget Monetization."[23]

53.    Through Perceptual Signature, Google uniquely identifies video titles and content: "Anvato processes videos (images and sounds) to extract a searchable, sortable sequence of numbers called Perceptual Signature.  This signature simulates the human perception of the video. It not only accurately and uniquely identifies the video and its content, but also it is very small and easy to search.  Perceptual Signature is not a mathematical artifact or a checksum; it contains

---

[21] ANVATO KNOWS, VIDEO, https://tinyurl.com/bdd9z4cb (archived: July 13, 2013).

[22] Jason Kincaid, *Anvato Raises $2 Million for Visual Fingerprinting*, TECH CRUNCH (Dec. 8, 2008), https://techcrunch.com/2008/12/08/anvato-raises-2-million-for-video-fingerprinting/.

[23] ANVATO, COMPANY, https://tinyurl.com/25t9pb5u (archived May 6, 2018).

unique information about the content of the video, such as scenes, objects and how these objects move."[24]

54.    Through onTarget Monetization, Google matches video content to prospective advertising content: "We integrate with the ad networks and automatically match the videos not only to the page content, but also to the viewers demographics and behavior. … Our platform tracks who watched your videos, and how they have engaged with them.  We statistically cluster the viewing habits and recommend how they need to be retargeted."[25]

55.    Anvato's own platform also confirms that they match the video ID to video title and content.  And it also confirms that Defendant knows Anvato does so.  The below exemplar is a platform page that a client, like Defendant, views:[26]

---

[24] ANVATO KNOWS, TECHNOLOGY CONTENT ID, https://tinyurl.com/4cyxyuty (archived Nov. 9, 2013).

[25] ANVATO KNOWS, TECHNOLOGY ONTARGET, https://tinyurl.com/54jhmhdk (archived July 16, 2013).

[26] ANVATO, REPORTING, https://tinyurl.com/4n6xvua4 (archived Apr. 18, 2018).



56.     This platform is created and maintained by Google.   Defendant transmits the necessary data to Google, who then processes, aggregates, and analyzes it.   Google then retools this data for its own purposes.  The platform shows that Google receives and analyzes: 1) the title of the video; 2) the number of views; 3) the locations where the videos are being accessed; 4) persistent identifiers, like AAIDs, for each device; and 5) the type of devices accessing the content.

57.     Google also offers to clients like Defendant the ability to "monitor which content is being viewed most in one particular geography, which sites and networks are referring more viewers to your content, which clips are making the most ad revenue and more."[27]

---

[27] ANVATO, SYNDICATION, https://tinyurl.com/2p9yeysr (archived Apr. 18, 2018).

58.     Anybody can link a MCP ID to a corresponding video title using publicly available data.  A MCP ID, therefore, is by itself sufficient to identify which video a consumer is watching.

E.     **NFL Discloses Class Members' PII To Google In Order To Maximize Advertising Revenue And Analyze Metrics**

1.     **Anvato Enables NFL To Maximize Revenue Through Use Of Class Members' PII**

59.     Defendant transmits a user's geolocation, AAID, and watch history to Google so it can maximize advertising revenue.

60.     Google's Anvato platform incorporates "Dynamic Server Side Ad Insertion."  At its most fundamental level, Dynamic Ad Insertion means Google targets an advertisement to a specific user.  So, for example, the Anvato platform will fill commercial breaks in videos on the NFL App by transmitting a user's geolocation, demographics, advertising profile, and watch history to an "ad server" that will then auction this PII to prospective advertisers.  The highest bidder gets to advertise on that specific user's stream.  This is not how advertising works for cable and broadcast television; instead, commercial space is purchased uniform across specific regions, so if two viewers watch a televised game in the same geographic space, they both will watch the same advertisements.

61.     Put differently: "Ad targeting uses a combination of means – postal codes, IP addresses, device recognition, and user data and can group audiences in places and times that are relevant to buying experience.  Anheuser-Busch, for example, may target 10,000 viewers in any Southern California zip code on especially hot weekend days between 1-5pm and offer them a customized message or promotions."[28]

---

[28] ANVATO, 3 THINGS TO CONSIDER WHEN CATERING YOUR OTT SERVICES TO MILLENNIALS (Nov. 2, 2016), https://tinyurl.com/24x9ffdd (archived June 6, 2017).

62.    The following graphic illustrates the concept:[29]



63.    Google further explains the method and purpose of Dynamic Ad Insertion in a whitepaper for Anvato, titled: "Best Practices for OTT Dynamic Ad Insertion."[30] "'OTT' stands for 'over-the-top' and refers to the [] practice of streaming content to customers directly over the web."[31]

64.    The whitepaper discusses, among other topics, "the implications of personalization and true user targeting, which are now a reality for OTT services using a variety of data sources (GPS, postal code, IP tables)."[32] "These capabilities", Google observed, "represent a great

---

[29] ANVATO, DYNAMIC VIDEO AD INSERTION, https://tinyurl.com/3fd9aja9 (archived Apr. 18, 2018).

[30] GOOGLE & ANVATO, BEST PRACTICES FOR OTT DYNAMIC AD INSERTION, https://cloud.google.com/solutions/media-entertainment/use-cases/dynamic-ad-insertion/external-whitepaper-best-practices.pdf, attached hereto as **Exhibit 2**.

[31] WHAT IS OTT? – UNDERSTANDING THE MODERN MEDIA STREAMING LANDSCAPE, https://www.tapjoy.com/resources/what-is-ott/

[32] BEST PRACTICES FOR OTT DYNAMIC AD INSERTION, at 2.

advance for OTT and the granular experiences it can provide."[33]  It means that "service providers can deliver adverts that are more relevant to the viewer, OTT is more impactful as an overall experience, and will likely drive ad rates (and revenue) higher over time."[34]

65.     Google collects this "user metadata" —including a user's geolocation, advertising ID, and watch history—and "relays" it to an "ad decisioning network."[35]  The ad decisioning network then "provisions the replacement ad, which is then seamlessly inserted into the video stream either server or client-side."[36]

66.     In a section titled "Individual Targeting and Hyper Local Ads", Google acknowledges "this technology could be used to support hyper local content."[37]  "So, when a viewer is watching a nationally delivered weather channel, for example, the local weather forecasts and commercial breaks can be targeted down to the postal code, providing them with ads and content most relevant to them."[38]

67.     Put simply, Defendant uses Dynamic Ad Insertion to maximize advertising revenue by "target[ing] ads for each individual user."[39]

---

[33] *Id.*

[34] *Id.*

[35] *Id.*, at 3.

[36] *Id.*

[37] *Id.*, at 4.

[38] *Id.*

[39] ANVATO, DYNAMIC VIDEO AD INSERTION, https://tinyurl.com/3fd9aja9 (archived Apr. 18, 2018).

##### 2. Defendant Discloses Class Members' PII to Google So It Can Analyze Performance Metrics

68.     Google's Anvato platform includes reports and analytics, allowing clients to "[a]ccess real-time metrics, player statistics and social metrics via a single intuitive dashboard."[40] As the first exemplar shows, this includes: (i) the title of the video; (ii) the number of views; (iii) the locations where the videos are being accessed; (iv) persistent identifiers, like AAIDs, for each device; and (v) the type of devices accessing the content.  For Google to synthesize and analyze this data, Defendant must first disclose it.

69.     Through its reporting, Google "collect[s] and store[s] billions of metrics and events and make[s] it easier for [clients] to make data-driven decisions."[41]  These reports are "continuously updated and metrics are reported as they occur."[42]

70.     As Google explains in its marketing materials for Anvato: "The information that describes how your content is performing is critical in shaping your decisions.  What clips are being viewed the most?  What content is in position to make you the most money via DAI [Dynamic Ad Insertion]? How long is it taking on average for your video to start playing? All these data elements and many others are available in the analytics suite of Anvato's MCP."[43]

71.     Anvato also provides "full support" for other analytic plug-ins, like Conviva.[44] Conviva is a third-party plug-in that provides app developers like Defendant with online video analytics on viewer engagement and video performance.  Anvato also enables app developers like

---

[40] ANVATO, REPORTING, https://tinyurl.com/4n6xvua4 (archived Apr. 18, 2018).

[41] *Id.*

[42] *Id.*

[43] SIGNAL-TO-SCREEN OTT SOLUTION BRIEF, at 9.

[44] ANVATO, PLAYERS, https://tinyurl.com/mrh8r3jh (archived Apr. 18, 2018).

Defendant to "use the data from MCP to complement other data sets from content delivery networks or other data analysis platforms," such as Conviva[45]

72.    The dynamic analysis commissioned by Plaintiff's counsel shows that Defendant partners with Conviva and other analytic companies.  Defendant uses Anvato to transmit users' geolocation, advertising ID, and watch history to Conviva and other third-party analytic services.

73.    Through its "Premium and Social Syndication" service, Google also allows Defendant to "monitor which content is being viewed most in one particular geography, which sites and networks are referring more viewers to [Defendant's] content, which clips are making the most ad revenue, and more."[46]

### F.    Defendant Intentionally And Knowingly Discloses Its Users' PII to Google

74.    Based on the above, it is abundantly clear that Defendant *intentionally* and *knowingly* discloses users' geolocation, AAID, and watch history to Google.

75.    Google's Anvato provides a dashboard that transparently shows what information Google is collecting, analyzing, and aggregating.  This includes what users are watching and where they are watching.  By using these dashboards, Defendant knows that it is disclosing a user's geolocation, AAID, and watch history to Google.

76.    NFL employees are knowledgeable about the capabilities of the Anvato platform. For instance, Mike DeBrincat works on Video Architecture with NFL Digital Media and, prior to that, worked with Fox Sports as an Executive Director.[47]  Fox Sports is featured in one of a handful

---

[45] ANVATO, PLAYERS, https://tinyurl.com/mrh8r3jh (archived Apr. 18, 2018).

[46] ANVATO, SYNDICATION, https://tinyurl.com/2p9yeysr (archived Apr. 18, 2018).

[47] MIKE DEBRINCAT, LINKEDIN, https://www.linkedin.com/in/mike-debrincat-4a16487.

of case studies that Google uses to market Anvato.[48]  In that case study, Mr. DeBrincat extols the advantages and benefits of Google's Anvato.[49]

77.    Mr. DeBrincat's involvement further establishes that Defendant knew the Anvato platform's capabilities and what information it collected.

## IV.    Experience of Plaintiff Daniel Louth

78.    In 2018, Plaintiff downloaded the NFL App on his LG Stylo 6 Android phone. When Plaintiff set up the NFL App, he enabled location services and push notifications.

79.    Plaintiff used the NFL App until June 2021 in the state of Rhode Island.  During that time, he used the NFL App to watch football games and video clips.

80.    At all times relevant, Plaintiff never consented, agreed, or otherwise permitted the NFL App to disclose his geolocation, AAID, and watch history to third parties.

81.    Likewise, Plaintiff was never given the opportunity to prevent the NFL App from disclosing his geolocation, AAID, and watch history to third parties.

82.    Nevertheless, each time Plaintiff viewed a video using the NFL App, Defendant disclosed his geolocation, AAID, and watch history to Google via the Anvato API.  Using this information, Google was able to identify Plaintiff and attribute his video viewing records to an individualized profile of Plaintiff in its databases.

## PARTIES

83.    Plaintiff Daniel Louth is, and has been at all relevant times, a resident of Hope Valley, Rhode Island and has an intent to remain there, and is therefore a domiciliary of Rhode Island.

---

[48] ANVATO, CASE STUDY, FOX SPORTS, https://tinyurl.com/yckr4mut (archived Aug. 14, 2017).
[49] Id.

84.     Defendant NFL Enterprise LLC is a Delaware corporation with its principal place of business at 280 Park Avenue New York, New York 10017.  Defendant develops, owns, and operates the NFL App, which is used throughout Rhode Island and the United States.

## JURISDICTION AND VENUE

85.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).  This Court has supplemental jurisdiction over Plaintiff's RIVPRA claim pursuant to 28 U.S.C. § 1367 because it is "so related" to Plaintiff's VPPA claim that it "form[s] part of the same case or controversy under Article III of the United States Constitution."

86.     This Court also has subject  matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and  costs,  and  at  least one  Class member  is  a  citizen  of  a  state  different  from Defendant.

87.     This Court has personal jurisdiction over Defendant because the NFL App collected and disseminated the personally identifiable information giving rise to this lawsuit in this District.

88.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District.

## CLASS ALLEGATIONS

89.     **Class Definition:**  Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who used the NFL App with location services enabled to watch videos and had their PII transmitted to a third party (the "Class").

90.     Plaintiff also seeks to represent a subclass of similarly situated individuals, defined as all Rhode Island residents who used the NFL App with location services enabled to watch videos and had their PII transmitted to a third party (the "Subclass").

91.     Collectively, the Class and the Subclass shall be known as the "Classes."

92.     Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

93.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiff does not know the exact number of members of the aforementioned Classes.  However, given the popularity of Defendant's App, the number of persons within the Classes is believed to be so numerous that joinder of all members is impractical.

94.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):**  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

> (a) whether Defendant collected Plaintiff's and the Classes' PII;
>
> (b) whether Defendant unlawfully disclosed and continues to disclose its users' PII, including their video viewing records, in violation of the VPPA;
>
> (c) whether Defendant's disclosures were committed knowingly; and
>
> (d) whether Defendant disclosed Plaintiff's and the Classes' PII without consent.

95.     **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiff's claims are typical of those of the Classes because Plaintiff, like all members of the Classes, used the NFL App to watch videos, and had their PII collected and disclosed by Defendant.

96.    **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring.  Plaintiff and his counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Classes.  Neither Plaintiff nor his counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Classes.  Plaintiff has raised viable statutory claims or the type reasonably expected to be raised by members of the Classes, and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes, additional claims as may be appropriate, or to amend the definition of the Classes to address any steps that Defendant took.

97.    **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable.  Even if every member of the Classes could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes.  Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE VPPA,
### 18 U.S.C. § 2710, *et seq.*

98.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

99.    Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against Defendant.

100.    Defendant is a "video tape service provider" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as it provides video (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via its NFL App.

101.    Plaintiff and members of the Classes are "consumers" as defined by the VPPA because he downloaded, installed, and watched videos using the NFL App.  18 U.S.C. § 2710(a)(1).  Under the VPPA, this means that he was a "subscriber" of "goods or services from a video tape service provider."   18 U.S.C. § 2710(a)(1); *see also Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 489 (1st Cir. 2016).

102.    Plaintiff and members of the Classes viewed videos using the App.  On information and belief, during these occasions the App disclosed Plaintiff's and class members' PII—including the device's Advertising ID, precise geolocation, and records of the videos that they viewed—to Google.

103.    The NFL App's transmissions of Plaintiff and class members' PII to Google constitutes "knowing[] disclosures" of their "personally identifiable information" to a person as proscribed by the VPPA.  18 U.S.C. § 2710(a)(1).

104.    Under the VPPA, the term "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).  The definition's usage of the word "includes" means that a more expansive reading of the term was expressly contemplated.

105.    The information disclosed by the NFL App constitutes "personally identifiable information" in this context because it allows Google to identify Plaintiff and class members. *Yershov*, 820 F.3d at 486.

106.    Plaintiff and members of the Classes did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third-parties.

107.    Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  In particular, the NFL App's disclosures to Google were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

108.    On behalf of himself and the Classes, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

<u>**COUNT II**</u>
**VIOLATION OF THE RIVRPA,**
**R.I. Gen. Laws § 11-18-32**

109.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

110.    Plaintiff brings this claim individually and on behalf of the members of the proposed Subclass against Defendant.

111.    Defendant, as the owner and operator of the NFL App, is a "distributor" of "video films … or the like."  *See* R.I. Gen. Laws § 11-18-32(a).

112.    By downloading the NFL App and watching videos, is an "individual" who "purchased, leased, rented, or borrowed" a "video film" or the like from Defendant.  *See id.*

113.    Plaintiff and subclass members viewed video clips using the App.  On information and belief, during these occasions the App disclosed their PII—including the device's Advertising ID, GPS coordinates, and records of the videos that they viewed—to third party analytics company Google.

114.    The PII that Defendant disclosed—Advertising ID, precise geolocation, and records of the videos viewed by Plaintiff and Subclass members—is sufficient to identify Plaintiff's and Subclass members' names and addresses.  *See id.*

115.     Plaintiff and Subclass members never consented to Defendant disclosing their video viewing history to third parties.

116.    Defendant did not disclose Plaintiff Subclass class members' PII incident to the normal course of Defendant's work or as part of lawful compulsion.  *See id.*

117.    By disclosing their PII and video viewing history, Defendant violated Plaintiff's and the Subclass's statutorily-protected right to privacy in their video viewing habits.  *See id.*

118.    Further, because subclass members' video-viewing history has economic value to Defendant, and because Defendant was obligated to comply with the RIVRPA, Defendant's unlawful disclosure of Plaintiff and Subclass members' PII and video viewing history deprived Plaintiff and Subclass members of the full value of their video viewing history.

119.    Because Plaintiff and Subclass members ascribe monetary value to the privacy of their video viewing information, Defendant's unlawful rental, exchange, and/or other disclosure caused them economic harm.

120.    In addition, Plaintiff would not have downloaded the NFL App had he been adequately informed of Defendant's disclosure practices.  By failing to do so, Defendant economically harmed Plaintiff and Subclass members.

121.    As a result of Defendant's unlawful disclosure of Plaintiff and Subclass members' PII and video viewing history, Plaintiff and Subclass members have suffered privacy and economic injuries.

122.    On behalf of himself and the Subclass, Plaintiff seeks (i) an injunction requiring Defendant to obtain consent from Rhode Island customers prior to the disclosures of their video viewing information as required by the RIVRPA; (ii) actual damages or $250.00, whichever is greater, for each violation, per Subclass member pursuant to R.I. Gen. Laws § 11-18-32(d); and (iii) costs and reasonably attorneys' fees pursuant to R.I. Gen. Laws § 11-18-32(d).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Daniel seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b)    For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)     An award of statutory damages to the extent available;

(e)     For punitive damages, as warranted, in an amount to be determined at trial;

(f)     For prejudgment interest on all amounts awarded;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated: January 3, 2022

Respectfully submitted,

**MCINTYRE TATE LLP**

By: */s/ Stephen M. Prignano*
         Stephen M. Prignano

Stephen M. Prignano
50 Park Row West, Suite 109
Providence, RI 02903
Tel: (401) 351-7700
Fax: (401) 331-6095
E-Mail: sprignano@mcintyretate.com

*Local Counsel for Plaintiff and the Putative Classes*

**BURSOR & FISHER, P.A.**
Yitzchak Kopel*
Max S. Roberts (*Pro Hac Vice*)
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: ykopel@bursor.com

- 28 -

mroberts@bursor.com

**BURSOR & FISHER, P.A.**
Christopher R. Reilly*
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 679-9006
E-Mail:  creilly@bursor.com


*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Putative Classes*

## **CERTIFICATE OF SERVICE**

     The undersigned hereby certifies that on January 3, 2022, a true and accurate copy of the foregoing document was filed electronically with the clerk of court via CM/ECF, which will then send a notification of such filing to all counsel of record and those who have registered for notice.


/s/ Stephen M. Prignano